FILED
2021 Mar-31  PM 05:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | | |
|---|---|---|
| **Zinta Renee Harner,** | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| | } | |
| **v.** | } | **Case No.:  4:19-cv-01808-MHH** |
| | } | |
| | } | |
| **Andrew Saul, Commissioner of the** | | |
| **Social Security Administration,** | | |
| | | |
| **Defendant.** | | |

## MEMORANDUM OPINION

Zinta Harner has asked the Court to review a final adverse decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).  After review, the Court affirms the Commissioner's decision.

### Procedural Background

Ms. Harner applied for a period of disability and disability insurance benefits on April 28, 2017, alleging that her disability began on August 5, 2016.  (Doc. 6-12, p. 5).  She alleged disabling conditions of degenerative disc disease, fatty liver, two

bulging discs in her lumbar spine, forminal stenosis, severe fatigue, a herniated disc in her cervical spine, radiculopathy from her lumbar spine to her legs, migraine headaches, asthma, and food allergies. (Doc. 6-10, p. 3). The Commissioner denied Ms. Harner's claim, and she requested a hearing before an Administrative Law Judge (ALJ). (Doc. 6-11, pp. 7, 13). After her hearing, the ALJ issued an unfavorable decision. (Doc. 6-3, pp. 38–58). The Appeals Council denied Ms. Harner's request for review, making the Commissioner's administrative decision final for this Court's judicial review. (Doc. 6-3, pp. 2–8); *see* 42 U.S.C. § 405(g).

## Standard of Review

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [her] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510–11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In making this evaluation, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for the ALJ's.

2

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).   If the ALJ's decision is supported by substantial evidence, a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards.   If the district court finds an error in the ALJ's application of the law, or if the district court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision.   *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

**The Regulatory Framework for Applications Filed after March 27, 2017**

The general rules guiding an ALJ's analysis of an application for SSI benefits are well-settled.   To be eligible for SSI benefits, a claimant must be disabled.   *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013).   "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin*, 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).

To determine if a claimant is disabled, an ALJ follows a five-step sequential evaluation process:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136–37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

The regulations governing the types of evidence that a claimant may present in support of his application for benefits or that the Commissioner may obtain concerning an application and the way in which the Commissioner must assess that evidence changed in March of 2017, and those changes apply to this case because Ms. Harner filed her application for benefits in April of 2017. Under the new regulations, evidence falls into five categories: objective medical evidence, including laboratory findings; medical opinions, meaning "a statement from a medical source about what you can still do despite your impairment(s) and whether

you have one or more impairment-related limitations or restrictions;" "other medical evidence" which includes all non-objective medical evidence such as medical history, diagnoses, and "judgments about the nature and severity of your impairments;" evidence from non-medical sources such as family members, employers, or others who have information relevant to an application for benefits; and prior administrative medical findings, which are findings, "other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see [20 C.F.R] § 404.900) in your current claim based on their review of the evidence in your case record . . . ." 20 C.F.R. § 404.1513(a).

The new regulations govern the way in which an ALJ must evaluate medical opinions and prior administrative medical findings from federal and state agency medical and psychological consultants.  Now, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [claimant's own] medical sources."  20 C.F.R. § 404.1520c(a).  Instead, an ALJ must evaluate each medical opinion using the following five factors:

(1) **Supportability.** The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) **Consistency.** The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

(3) **Relationship with the claimant.** This factor combines consideration of the issues in paragraphs (c)(3)(i)-(v) of this section.

   i.   Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

   ii.   Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

   iii.   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

   iv.   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).

   v.   Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

(4) **Specialization.** The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

(5) **Other factors.** We will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding. This includes, but is not limited to, evidence showing a

medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. When we consider a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive.

20 C.F.R. § 404.1520c(c)(1)-(5) (emphasis added).

In his written decision, an ALJ must state the extent to which he found the medical opinions and prior administrative medical findings in the record persuasive, using the following criteria:

(1) **Source-Level Articulation.** Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) **Most Important Factors.** The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior

administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) **Equally Persuasive Medical Opinions or Prior Administrative Medical Findings About the Same Issue.** When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3) (emphasis added).

The new regulations do not address the way in which an ALJ should weigh other evidence including diagnoses that do not include opinions concerning impairment-related limitations or restrictions, objective medical evidence such as test results, and testimony provided during administrative hearings.[1]  The regulations state that an ALJ does not have to explain how he considered evidence from non-medical sources using the standards in 20 C.F.R. § 404.1520c(a), (b), and (c).  20 C.F.R. § 405.1520c(d).[2]

_____

[1] The parties do not cite to, and the Court has not identified, controlling regulations in this area.

[2] *See Rochelle S. v. Saul*, No. C20-5532-MAT, 2021 WL 252925, at *3 (W.D. Wash. Jan. 25, 2021) ("Under the regulations the ALJ cited, [§ 416.920c(d)] she was 'not required to articulate how [she] considered evidence from nonmedical sources using the requirements' for medical sources, such as supportability, consistency, and treating relationship."); *Melanie Lynne H. v. Saul*, No. 20-1028-JWL, 2020 WL 6262913, at *6 (D. Kan. Oct. 23, 2020); *Wright v. Comm'r of Soc.*

## The Administrative Law Judge's Findings

The ALJ found that Ms. Harner had not engaged in substantial gainful activity since August 5, 2016, the alleged onset date. (Doc. 6-3, p. 44). The ALJ determined that Ms. Harner suffered from the following severe impairments: spine disorders, fibromyalgia, and migraines. (Doc. 6-3, p. 44). The ALJ noted that Ms. Harner's medical records "indicate[d] fatty liver, food allergies, asthma, coronary artery disease, sleep apnea, essential hypertension, hyperlipidemia, frequent sinus infections, and obesity," but found that "the evidence does not establish that these impairments reach the severity standard under the regulations." (Doc. 6-3, p. 44). The ALJ explained that while "the evidence indicates the above-mentioned conditions were generally resolved with appropriate treatment or never lasted 12 continuous months," he nevertheless "considered all of [Ms. Harner's] medically determinable impairments, including those that are not severe, when assessing her residual functional capacity." (Doc. 6-3, p. 44).

---

*Sec.*, No. 2:19-cv-1124, 2020 WL 5651540, at *6 (S.D. Ohio Sept. 23, 2020); *Simone V. v. Saul*, No. 19-2577-JWL, 2020 WL 5203461, at *4 (D. Kan. Sept. 1, 2020); *Ryan L. F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *8 (D. Or. Dec. 2, 2019) ("Although the ALJ must consider evidence from nonmedical sources pursuant to [20 C.F.R.] §§ 404.1520c(d) and 416.920c(d) of the new regulations, the ALJ is 'not required to articulate how [he] consider[s] evidence from nonmedical sources' and he . . . does not have to use the same criteria as required for medical sources.").

The ALJ determined that Ms. Harner's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (Doc. 6-3, p. 47).  Based on a review of the extensive medical evidence, the ALJ concluded that Ms. Harner did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 6-3, p. 46).

Given Ms. Harner's impairments, the ALJ evaluated her residual functional capacity and determined that Ms. Harner had the RFC to perform:

> light work as defined in 20 CFR 404.1567(b) except occasionally climbing ramps or stairs, never climbing ladders, ropes or scaffolds, occasionally balancing, stooping, kneeling, crouching or crawling, frequently reaching overhead bilaterally, must avoid all exposure to unprotected heights, unprotected moving mechanical parts and dangerous machinery, must alternate sitting and standing every 20-30 minutes throughout the work day in order to change position for a brief positional change of less than 5 minutes but without leaving the work station.

(Doc. 6-3, p. 46).  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).  "If someone

can do light work, . . . she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

Based on this RFC, the ALJ concluded that Ms. Harner could perform her past relevant work as a receptionist and travel agent. (Doc. 6-3, p. 51). Ms. Harner was 50 years old, "which is defined as an individual closely approaching advanced age, on the alleged disability onset date." (Doc. 6-3, p. 52) (citing 20 C.F.R. § 404.1563). Ms. Harner had at least a high school education and can communicate in English. (Doc. 6-3, p. 52) (citing 20 C.F.R. § 404.1564). The ALJ concluded that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Ms. Harner] is 'not disabled,' whether or not [she] has transferable job skills." (Doc. 6-3, p. 52) (citing SSR 82-41; 20 C.F.R. Part 404, Subpart P, Appendix 2). In addition to concluding that Ms. Harner could perform her past relevant work, the vocational expert who testified at the ALJ hearing identified two other jobs Ms.

Harner could perform: office helper (Dictionary of Occupational Titles No. 239.567.010) and mail sorter (Dictionary of Occupational Titles No. 209.687.026). (Doc. 6-3, pp. 52–53).

Based on this evidence, the ALJ concluded Ms. Harner was not disabled and not entitled to benefits.  (Doc. 6-3, p. 53).

### The Evidence

#### *Objective Medical Evidence and Other Medical Evidence*

Ms. Harner's medical records confirm that she had suffered from a history of musculoskeletal impairments through the disability period.  A May 7, 2017 lupus panel showed a positive result on the ANA screen.  (Doc. 6-5, p. 13).[3]  The panel also showed Ms. Harner tested negative for DNA Ab (ds) Crithidia, IFA; Striated Muscle Ab; and Myocardial AB, IF.  (Doc. 6-5, p. 13).[4]  On June 22, 2017,

---

[3] ANA TESTING, LUPUS RESEARCH ALLIANCE, https://www.lupusresearch.org/understanding-lupus/diagnosis-and-treatment/ana-testing/ (last visited Mar. 16, 2021) ("The antinuclear antibody (ANA) test is commonly used to look for autoantibodies that attack components of your cells' nucleus, or 'command' center, triggering autoimmune disorders like lupus.  95% of people with lupus test positive for ANA, but a number of other, non-lupus causes can trigger a positive ANA, including infections and other autoimmune diseases.  The ANA test simply provides another clue for making an accurate diagnosis.").

[4] DOUBLE-STRANDED DNA (DSDNA) ANTIBODY, IGG BY IFA (USING *CRITHIDIA LUCILIAE*), ARUP LABORATORIES, https://ltd.aruplab.com/Tests/Pub/2002693 (last visited Mar. 16, 2021) ("Positive for anti-double stranded DNA (anti-dsDNA) igG antibody is a diagnostic criterion of systematic lupus erythematosus (SLE).  The presence of the anti-dsDNA IgG antibody is identified by IFA titer (*Crithidia luciliae* indirect fluorescent test [CLIFT]).  CLIFT is highly specific for SLE with a sensitivity of 50-60 percent.").

STRIATIONAL (STRIATED MUSCLE) ANTIBODIES, SERUM, MAYO CLINIC LABORATORIES, https://www.mayocliniclabs.com/test-catalog/Clinical+and+Interpretive/8746 (last visited Mar.

rheumatologist Dr. Vishala Chindalore examined Ms. Harner and wrote that Ms.

Harner:

> has [had] problems with joints onset many years ago. Morning stiffness
> lasts 2 hours. Has not had any intra articular injs or aspirations. Has
> hypertension, no diabetes, heart problems, seizures, strokes, ulcers,
> bleeding, transfusions. No changes in weight, bowel or bladder habits,
> skin rashes, psoriasis, tickbites, infections, hairloss, dry mouth, sores in
> the mouth, photosensitivity or Raynaud's. Has dry eyes. Cannot sleep
> well, under stress, gets fatigued. No blood clots, 2 miscarriages, 1
> abortion. States grandparents have arthritis, unsure of type. Gets
> mammograms and DEXA regularly. Had hyst. No smoking or drug
> abuse. Drinks alcohol. Lives in Centre with spouse. Kids-none. Does
> not work….AN8 Has joint pains and has ANA 1:80 homo pattern, lupus
> profile neg and has low C3. Has some hair loss, no oral ulcers, no
> photosensitivity, skin rashes.

(Doc. 6-24, p. 60). Dr. Chindalore ordered x-rays of Ms. Harner's hand, knees, and

hips, and noted that Ms. Harner has OA/fibromyalgia features. (Doc. 6-24, pp. 64–

65). In an August 3, 2017 follow-up, Dr. Chindalore noted Ms. Harner's ANA was

slightly abnormal but that her lupus profile was negative. (Doc. 6-25, p. 70). While.

---

16, 2021) (Used "[a]s a serological aid in the diagnosis of thymoma [a tumor originating from the epithelia cells of the thymus that is considered a rare malignancy], especially in patients with onset of myasthenia gravis (MG) younger than 45 years[.] [Useful] [a]s a screening test for MG in older patients, especially when tests for muscle acetylcholine receptor (AChR) antibodies are negative.").

MYOCARDIAL ANTIBODY SCREEN, REFLEX TITER, HEALTHLAB, https://www.healthlabtesting.com/Test%20Directory/Test%20Directory%20Item.aspx?itemGuid=df72a68c-a092-4255-9846-cbe5df6d0ce0 (last visited Mar. 16, 2021) ("Detection of myocardial antibodies suggests that a patient's heart disease may have an immunologic component. Myocardial antibodies are found in the serum of patients with various cardiomyopathies, especially idiopathic dilated cardiomyopathy, myocarditis, rheumatic fever, and Dressler's Syndrome.").

Ms. Harner had a low positive ANA, she had no other criteria for lupus. (Doc. 6-25, p. 70). Dr. Chindalore described Ms. Harner's joint pain:

> Symptoms include joint pain, joint swelling, joint stiffness and morning stiffness. Symptoms are located in the neck, lower back, left shoulder, left metacarpal phalangeal joint, left proximal interphalangeal joint, left distal interphalangeal joint, left hip, right shoulder, right metacarpal phalangeal joint, right proximal interphalangeal joint, right distal interphalangeal joint and right hip. [Ms. Harner] describes the pain as aching. The symptoms occur constantly. Currently the symptoms occur daily. [Ms. Harner] describes this as moderate in severity and worsening. Symptoms are exacerbated by inactivity. The pain radiates to the hand, thigh and lower leg. Associated symptoms include fatigue and myalgia. [Ms. Harner] is not currently being treated for this problem. [Ms. Harner] was previously evaluated by a primary care provider (Kristy Burt, NP/Dr. K. Duryea). Past treatment has included physical therapy. Note for "Joint pain". Has been in pain management in the past, sees the Chiropractor, Epidurals, trigger point injections, massages.

(Doc. 6-25, p. 70). Dr. Chindalore described Ms. Harner's fibromyalgia symptoms as "includ[ing] widespread pain and diffuse tenderness. [Ms. Harner] describes the pain as aching." (Doc. 6-25, p. 70). Dr. Chindalore started Ms. Harner on 30mg of Cymbalta. (Doc. 6-25, p. 70).[5]

---

[5] DULOXETINE [CYMBALTA] (ORAL ROUTE), MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/duloxetine-oral-route/description/drg-2006724 ("Duloxetine [Cymbalta] is used to treat depression and anxiety. It is also used for pain caused by nerve damage associated with diabetes (diabetic peripheral neuropathy). Duloxetine is also used to treat fibromyalgia (muscle pain and stiffness) and chronic (long-lasting) pain that is related to muscles and bones. Duloxetine belongs to a group of medicines know as selective serotonin and norepinephrine reuptake inhibitors (SSNRIs). These medications are thought to work by increasing the activity of the chemicals called serotonin and norepinephrine in the brain.") (last visited Mar. 19, 2021).

On April 4, 2018, and June 19, 2018, Ms. Harner followed up with Dr. Chindalore.  (Doc. 6-25, pp. 92, 95).  She was taking 60mg of Cymbalta daily, and continued to have some pain.  (Doc. 6-25, pp. 92, 95).  During an April 2, 2019, follow-up appointment, her records show she was taking 90mg of Cymbalta daily and continued to have some pain.  (Doc. 6-26, p. 57).

On January 9, 2017, Ms. Harner visited the Primary Care Centre to ask for a referral to a back specialist.  (Doc. 6-8, p. 40).  Ms. Harner explained that she had been seeing a physician in Breeman, Georgia, but needed to get established in Alabama.  (Doc. 6-8, p. 40).  She denied fatigue, fever, headaches, vertigo, and dizziness, and rated her pain a 3/10.  (Doc. 6-8, p. 41).  She also told the physician that she had experienced at least two falls in the preceding 12 months, at least one of which caused her injury.  (Doc. 6-8, p. 42).  The physician referred her to a neurosurgeon to evaluate her back pain.  (Doc. 6-8, p. 42).

On February 7, 2017, Ms. Harner underwent an MRI of her cervical spine without contrast due to cervical radiculopathy and cervical stenosis of the spinal canal.  (Doc. 6-8, p. 7).  The findings showed:

> Curvature, vertebral body heights, intervertebral disc spaces, and alignment are maintained.  Narrow signal and intervertebral disc signal is preserved throughout.  The cervical spinal cord demonstrates mild dilation of the central canal at the level of C7 measuring only 1.5 mm. There is no evidence of intrinsic cord lesion, cord expansion, or cerebellar tonsil ectopia.  Included portions of the posterior fossa are within normal limits.  Surrounding soft tissues of the neck and vascular flow voids are grossly preserved.

(Doc. 6-8, p. 7). Her C2-3, C3-4, C-4-5, and C7-T1 vertebrae were all within normal limits, but her C5-6 vertebrae had "[m]ild circumferential disc bulge, with mild spinal stenosis but no cord impingement. There is no evidence of neural foraminal stenosis." (Doc. 6-8, p. 8). And her C6-7 vertebrae had a "[s]mall left paracentral disc extrusion, with caudal migration of disc material behind the C7 vertebral body. There is mild spinal stenosis, without evidence of cord impingement. There is no evidence of neural foraminal stenosis." (Doc. 6-8, p. 8).

She also underwent an MRI of her lumbar spine without contrast due to low back pain with bilateral leg numbness. (Doc. 6-8, p. 9). The findings showed:

> There are 5 nonrib-bearing lumbar vertebral bodies. No listhesis of L4 relative to L5 measures approximately 3 mm and is thought to be accounted for by degenerative changes. Otherwise, alignment appears within normal limits. Mild endplate degenerative signal changes are present. No acute fracture is seen. Edema within the right and left pedicles of L4 and L5 is present which may be related to degenerative facet changes or stress phenomenon. Vertebral body heights are normal. The distal spinal cord morphology and signal intensity is normal. The conus medullaris terminates normally. Visualized posterior abdomen and pelvis are within normal limits.

(Doc. 6-8, p. 9). Her T12-L1, L1-2, L2-3, and L3-4 vertebrae were normal. (Doc. 6-8, p. 10). At her L4-5 vertebrae, the physician noted:

> Severe facet disease is present on the right and left. Small facet joint effusions are present. Synovial cysts extend dorsally from the right and left facets. On the left, this measures approximately 8 mm in size. On the right, there is intraspinal extension of this cyst which measures approximately 5 mm in size. This contributes to crowding of nerves in the thecal sac. Uncovering of disc space is present with a mild broad bulge. Moderate crowding of nerves in the thecal sac is present.

16

> Narrowing of the lateral/subarticular recess is present and is thought to be at least moderate, left greater than right. Displacement of transiting L5 nerve some of the right and left is possible. Moderate foraminal narrowing on the left and right is noted. Disc bulge may abut the existing L4 nerves also.

(Doc. 6-8, p. 10). And at the L5-S1, the physician noted "[m]oderate left foraminal disc protrusion is superimposed on a moderate broad bulge mild facet disease is present. Mild foraminal narrowing on the right with moderate narrowing on the left is present. Disc bulge may displace the existing left L5 nerve." (Doc. 6-8, p. 10).

On June 7, 2017, Ms. Harner visited Atlanta Brain and Spine Care where she was evaluated by neurosurgeon Dr. Michele Johnson. (Doc. 6-24, p. 51). Dr. Johnson wrote that Ms. Harner had "a long history of chronic back pain" and "has been experiencing new numbness in her right>left legs and increasing back pain over the last 2-3 years." (Doc. 6-24, p. 51). Ms. Harner had lumbar epidurals with minimal benefit and "describes the burning numbness as running down her lateral legs into her entire feet." (Doc. 6-24, p. 51). Dr. Johnson identified four current problems Ms. Harner suffered from: spondylolisthesis, lumbar region; intervertebral disc disorders with radiculopathy, lumbar region; low back pain; and other spondylosis with radiculopathy, lumbar region. (Doc. 6-24, p. 53). Dr. Johnson wrote that Ms. Harner "would greatly benefit from L4-S1 SLIF followed by a posterior lumbar fusion." (Doc. 6-24, p. 53).

On October 3, 2017, Ms. Harner underwent spinal surgery. (Doc. 6-26, p. 10). Her preoperative diagnoses included: (1) L4-5 and L5-S1 severe degenerative disk disease; (2) herniated disk, bilateral neural foramineal stenosis with mild-to-moderate central stenosis from L4-S1; (3) low back pain and grade 1 spondylolisthesis at L4/5; and (4) lumbar radiculopathy L4-S1. (Doc. 6-26, p. 10). Dr. Johnson and a vascular surgeon conducted three procedures as part of Ms. Harner's surgery: (1) transperitoneal approach for an anterior L4-5 and L5-S1 diskectomy, bilateral foraminotomy; (2) L4-5 and L5-S1 two-level interbody fusion using a NuVasive cage with BMP sponge and cancellous allograft use for arthrodesis x2 levels; and (3) L4-S1 anterior instrumentation using the NuVasive system. (Doc. 6-26, p. 10). Dr. Johnson explained that she had "achieved great reduction of the L4/5 spondyloliethesis," and that Ms. Harner "had good bone quality . . . ." (Doc. 6-26, p. 11).

On August 27, 2018, Ms. Harner visited Dr. Johnson for a follow-up appointment. (Doc. 6-26, p. 3). Dr. Johnson noted that Ms. Harner "no longer feels any leg pain." (Doc. 6-26, p. 3). But Ms. Harner did report "burning numbness . . . running down her lateral legs into her entire feet" and "some central neck pain which has been treated with trigger point injections unsuccessfully." (Doc. 6-26, p. 3). Ms. Harner's gait and coordination were normal, and her neck had a normal range of motion. (Doc. 6-26, p. 4).

In a February 27, 2019 treatment note, a physician notes that Ms. Harner "is compliant with her treatment and medications, and she is doing well with her medications."  (Doc. 6-26, p. 25).  On March 28, 2019, Ms. Harner had a tele-med appointment.  (Doc. 6-26, p. 21).[6]  The physician noted:

> [Ms. Harner] says she is doing ok, but says she is not sleeping too well. She wants to go up on her Cymbalta because she says it helps her fibromyalgia.  She says because she does not have insurance she can not afford to go and see her rheumatologist.  She says her depression is better.  She says she has crying spells sometimes but not as bad as before.  She says the Rexulti does help her.  She says her medication has not come through the PAP and she says she will come and get samples but she says when she does not have the samples she can tell a difference.  She denies any lethal ideations.  She says she is living in a camper in her best friends yard.

(Doc. 6-26, p. 21).

### *Mental Health Treatment*

On June 29, 2018, Ms. Harner sought mental health treatment at Grandview Behavioral Health Centers.  (Doc. 6-4, p. 73).  Her intake forms show that her chief complaint was that she was having issues due to her fibromyalgia "but everything is getting worse."  (Doc. 6-4, p. 73).  She reported her physical pain as 10/10 and said that nothing made the pain better.  (Doc. 6-4, p. 74).  Throughout July 2018, Ms. Harner was under the care of Ramone Pettry, CRNP-BC.  (Doc. 6-4, p. 66).  NP Pettry diagnosed Ms. Harner with depression and anxiety.  (Doc. 6-4, p. 78).

---

[6] The date may be March 26, 2019; the medical record is not completely legible.

A July 20, 2018 treatment note shows that Ms. Harner had been crying all day and felt like she was losing her mind.  (Doc. 6-4, p. 71).  In an August 23, 2018 treatment note, NP Pettry noted Ms. Harner was experiencing "frequent crying, sadness" and "financial stress" and had a hearing in her divorce on August 28th. (Doc. 6-4, p. 70).

***Medical Opinions***

### Dr. Vishala Chindalore

On December 11, 2017, Ms. Harner's rheumatologist, Dr. Vishala Chindalore, completed a "Medical Opinion RE: Ability to do Work-Related Activities."  (Doc. 6-25, p. 78).[7]  Dr. Chindalore advised that Ms. Harner became unable to work on August 5, 2016.  (Doc. 6-25, p. 78).  The form indicated that Dr. Chindalore believed Ms. Harner could occasionally lift and carry 10 pounds, could frequently lift and carry less than 10 pounds, could stand and walk less than two hours per day, and could sit less than two hours per day.  (Doc. 6-25, pp. 78–79).  According to Dr. Chindalore, Ms. Harner could sit and stand about 15 minutes before changing positions and had to walk around every 15 minutes for a period of 10 minutes at a time.  (Doc. 6-25, p. 79).  Ms. Harner needed the opportunity to shift at will from

---

[7] *See Schinck v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1261 (11th Cir. 2019) ("[T]he regulations do not require a doctor's opinion to take a certain form.  On the contrary, they expressly contemplate that medical sources 'may'—but need not—use terms similar to those used in the regulations and may—but need not—use them in exactly the same was as the Administration if they do.").

sitting or standing to walking and would need to lie down at unpredictable intervals. (Doc. 6-25, pp. 79–80). This could happen "several times a day, depending on [her] pain levels." (Doc. 6-25, p. 80).

Dr. Chindalore explained these restrictions were supported by Ms. Harner's fibromyalgia, positive lupus test, pressure point testing, and back fusion. (Doc. 6-25, p. 80). Dr. Chindalore indicated that Ms. Harner could occasionally climb stairs, but could never twist, stoop (bend), crouch, or climb ladders. (Doc. 6-25, p. 80). And her impairments affected her ability to reach (including overhead), handle items (gross manipulation), finger items (fine manipulation), feel, and push/pull. (Doc. 6-25, p. 80). These functions were affected by Ms. Harner's "severe pain" and "onsets of migraines." (Doc. 6-25, p. 80).

Ms. Harner's impairments were "likely to produce 'good days' and 'bad days,'" and would likely cause her to be absent more than four days per month. (Doc. 6-25, p. 82). Dr. Chindalore explained that the following limitations would affect Ms. Harner's ability to work: "Inability to sit + stand for short or long periods of time, and the use of hands due to fibromyalgia pain + discomfort. [Ms. Harner] does not sleep during the nights due to pain. She also states she is feeling depressed due to constant pain." (Doc. 6-25, p. 82).

**Dr. Michele Johnson**

On January 8, 2018, Ms. Harner's neurosurgeon, Dr. Michele Johnson, completed a "Medical Opinion RE: Ability to do Work-Related Activities." (Doc. 6-25, p. 85). Like Dr. Chindalore, Dr. Johnson advised that Ms. Harner became unable to work on August 5, 2016. (Doc. 6-25, p. 85). Dr. Johnson noted that Ms. Harner could occasionally lift and carry 10 pounds and could frequently lift and carry less than 10 pounds. (Doc. 6-25, pp. 85–86). Dr. Johnson believed that Ms. Harner could stand and walk less than two hours per day, could sit less than two hours per day, and could only sit or about 15 minutes before needing to change position. (Doc. 6-25, p. 86). Ms. Harner needed to walk around about every 15 minutes, and each walk must be about 10 minutes. (Doc. 6-25, p. 86). Ms. Harner needed the opportunity to shift at will from sitting or standing to walking. (Doc. 6-25, p. 86).

Dr. Johnson explained that she performed a spinal fusion surgery on Ms. Harner and her rheumatologist had diagnosed Ms. Harner with fibromyalgia; these medical findings supported the above limitations. (Doc. 6-25, p. 87). She noted that Ms. Harner's back would take a minimum of nine months to heal, and she could not bend, lift more than 10 pounds, or twist during that time. (Doc. 6-25, p. 89).

### Nurse Practitioner Pettry's Assessment

On July 20, 2018, Ramona Pettry, CRNP-BC, prepared the following medical opinion of Ms. Harner:

> Zinta Harner is my patient and has been under my care since July 2, 2018.  I am intimately familiar with her history and with the functional limitations imposed by her emotional/mental health-related issue.
>
> Due to this emotional disability, Zinta has certain limitations coping with what would otherwise be considered normal, but significant day to day situations.  To help alleviate these challenges and to enhance her day to day functionality, I have recommended Zinta to obtain an emotional support animal.  The presence of this animal is necessary for the emotional/mental health of Zinta Harner because its presence will mitigation the symptoms she is currently experiencing.

(Doc. 6-25, p. 100).  A second letter, prepared the same day, adds an additional sentence asking that Ms. Harner be allowed to be accompanied by her emotional support animal on an airplane.  (Doc. 6-25, p. 101).

### Dr. Williams's Assessment

On August 15, 2017, Dr. Samuel Williams prepared a non-examining consultative review of Ms. Harner's medical records and disability claim.  (Doc. 6-10, pp. 2–12).  Dr. Williams reviewed medical records from MDSI Physician Group; Anniston Medical Center; Atlanta Brain & Spine Care; Harbin Neurosurgery; Chiropractor Kirk Keener; Primary Care group of West Georgia; Floyd Primary Care Centre; Alliance Pain and Spine; Tanner Medical Center; Carrollton Ear Nose & Throat; Carrolton Orthopaedic Clinic; Advanced Chiropractic Solutions; and

evidence provided by Ms. Harner.  (Doc. 6-10, pp. 3–7).  Because Dr. Williams

reviewed these records in August 2017, he did not review the medical opinions

provided by Drs. Chindalore and Johnson in January 2018.

Included in Dr. Williams's assessment are notes from disability adjudicator

Shannon Reaid, which appear to be from a conversation she had with Ms. Harner on

June 21, 2017:

> [Ms. Harner] stated she is not scheduled for a C-spine or L-spine
> surgery.  She stated her husband just had L-spine surgery and they are
> waiting on him to heal before they schedule her L4/5 surgery.  She said
> she does not know when this will be.  She said she had imaging of her
> L-spine at Harbin Neurosurgery in 2015 (this MER has been requested)
> and has an apt 6/30 at Piedmont Atlanta for CT L-spine.  She said she
> kept her apt 6/7 at Atlanta Brain and Spine with Dr. Johnson.  She said
> she has an apt still with Dr. Chindalore 6/22.  Only other upcoming apt
> she has is 7/26 for labs with Dr. Burt at Floyd Primary Care.
>
> Memory/concentration/understanding:  Said she will misplace things
> sometimes.  Said she will talk with someone sometimes and forget
> things later on.  Said she is able to drive and remember familiar
> locations.  Her husband in the background said it is her short-term
> memory.  She said that she has to make lists when she goes grocery
> shopping.  Said she writes her doctor appointments down in her planner.
> Said she can remember where she went to school and most past events.
> Said she can remember what she ate for dinner yesterday.  Able to
> remember some of her family's Dos, but has to write some of those
> down in her planner.  Said she is able to following along with the plot
> of a TV/movie and generally remember it afterward.  Has not discussed
> her issues with a doctor.  Said she thinks it is related to pain.

(Doc. 6-10, p. 8).  The notes indicate a consultative examination was not required.

(Doc. 6-10, p. 9).

Dr. Williams prepared a "findings of fact and analysis of evidence." (Doc. 6-10, pp. 9–12). He listed two severe impairments from which he believed Ms. Harner suffered:   the primary impairment of "spine disorders" and the secondary impairment of fibromyalgia. (Doc. 6-10, p. 11). With respect to mental medically determinable impairments, Dr. Williams noted that Ms. Harner "did not initially allege any mental impairments" and that "[t]he issues she stated [with respect to mental impairments] are issues that are typically encountered by 'average' individuals without any mental impairment, such as, writing items down on a grocery list, writing down dates in a calendar, forgetting detains of a conversation from days earlier, and misplacing items." (Doc. 6-10, p. 11).

**Dr. Amason's Assessment**

On August 15, 2017, Dr. Thomas Amason prepared another portion of the non-exam consultative report on Ms. Harner. (Doc. 6-10, pp. 12–19). Dr. Amason found that Ms. Harner could occasionally lift and carry up to 20 pounds and could frequently lift and carry up to 10 pounds. (Doc. 6-10, p. 13). He found she could stand and walk about six hours in an eight-hour workday and could push and pull without limitation "other than shown, for lift and/or carry." (Doc. 6-10, p. 13). Because of Ms. Harner's "L-spine and C-spine bulging," Dr. Amason found Ms. Harner has postural limitations and that she could never climb ladders, ropes, or scaffolds as a precaution. (Doc. 6-10, p. 14).

Dr. Amason found that Ms. Harner was limited in reaching overhead, both in the right and left direction. (Doc. 6-10, p. 14). But Dr. Amason found that Ms. Harner was not limited in her handling (gross manipulation), fingering (fine manipulation), and feeling (skin receptors). (Doc. 6-10, p. 14). Ms. Harner's limitation in overhead reaching was due to her syrinx C-spine. (Doc. 6-10, p. 14).[8]

Dr. Amason concluded that "[b]ased on the seven strength factors of the physical RFC (lifting/carrying, standing, walking, sitting, pushing, and pulling)," Ms. Harner had the maximum sustained work capability to perform light work. (Doc. 6-10, p. 18). Dr. Amason recommended as representative occupations assembler, production; wireworker; and subassembler. (Doc. 6-10, p. 18). These jobs are in the light work category. *See* Dictionary of Occupational Titles Nos. 706-687-010 (Assembler, Production); 728.684-022 (Wireworker); and 729.684-054 (Subassembler).

---

[8] Michael Rubin, *Syrinx of the Spinal Cord of Brain Stem*, Merck Manual, https://www.merckmanuals.com/professional/neurologic-disorders/spinal-cord-disorders/syrinx-of-the-spinal-cord-or-brain-stem ("A syrinx is a fluid-filled cavity within the spinal cord (syringomyelia) . . . Symptoms include flaccid weakness of the hands and arms and deficits in pain and temperature sensation in a capelike distribution over the back and neck[.]") (last visited Mar. 18, 2021).

**Dr. Hewlett's Consultative Examination**

On July 1, 2017, Dr. Nathan Hewlett performed a consultative examination of Ms. Harner.  (Doc. 6-24, p. 68).   Dr. Hewlett noted Ms. Harner's five chief complaints:  low back pain, fibromyalgia, migraines and headaches, chronic fatigue, and insomnia.  (Doc. 6-24, p. 68).  Dr. Hewlett wrote that Ms. Harner had:

> a history of low back pain.  She states it is secondary to a disc bulge at L4-L5 and L5-S1.  She states that she has had pain for years that has progressed to a 9/10 severity and is constant.  She denies aggravating or alleviating symptoms.  She states that medications do not really help this.  She has had multiple epidural and trigger point injections, which have provided minimal relief.  She states that she has radiation of the pain with numbness to the bilateral, right greater than left legs.  She states that she is scheduled for spinal surgery at L4-L5.  The claimant also endorses diffuse joint paints worse in her shoulders, neck, and hands.  She states the pain 8 or 9/10 in severity and constant.  She states that she has been diagnosed with lupus and fibromyalgia.  She states that she underwent a breast reduction in 2016, which did not help her low back pain or neck pain.  She states that she has tried Lyrica, which has not alleviated her diffuse pain; however, she has only been taking it for approximately one week.   She states that she experiences migraines approximately 1-2 times a week.  She takes Imitrex.  She describes an eye pressure and frontal pain that radiates to her back.  She states that she also experiences frequent sinus pressure and headaches.  [Ms. Harner] also endorses chronic fatigue.   She states that she experiences insomnia and only achieves 3-4 hours of sleep a night.

(Doc. 6-24, pp. 68–69).   Dr. Hewlett noted that Ms. Harner could enter the examination room without difficulty and could sit comfortably throughout the exam. (Doc. 6-24, p. 70).  She was "able to manipulate fine objects without difficulty." (Doc. 6-24, p. 70).  Her gait was normal, she could walk on her heels and toes equally, and could perform "finger-nose-finger test and rapid alternating hand

movements without difficulty." (Doc. 6-24, p. 71). After evaluating Ms. Harner's range of motion, Dr. Hewlett found "[n]o evidence of crepitus or effusion in the bilateral knees." (Doc. 6-24, p. 72).

Dr. Hewlett also evaluated Ms. Harner's fine motor skills. He found that Ms. Harner:

> is able to grip and hold objects securely to the palm by the last three digits. [Ms. Harner] is able to grasp and manipulate both large and small objects with the first three digits. [Her] thumb functions with normal opposition. There is no evidence of myotonia or grip release. There is no evidence of localized tenderness, erythema, or effusion. There is no evidence of diminution of function with repetition. There is no evidence of spasticity or ataxia. Normal sensation to touch and pinprick in all fingers. Joint position and vibration sense are normal. Subjective and objective findings are consistent.

(Doc. 6-24, p. 72). Dr. Hewlett reported Ms. Harner's diagnoses of lumbago, fibromyalgia, migraines, chronic fatigue, and insomnia. (Doc. 6-24, p. 72).

Dr. Hewlett created a functional assessment, concluding that Ms. Harner could stand/walk up to six hours with a limited range of motion of her lumbar spine. (Doc. 6-24, p. 72). She could lift/carry/push/pull 30 pounds occasionally and 20 pounds frequently. (Doc. 6-24, p. 73). Ms. Harner had no limitations on fine or gross manipulative activities, "including reaching overhead, reaching forward, handling, fingering, and feeling." (Doc. 6-24, p. 73).

*Evidence from Non-Medical Sources*

### Headache Questionnaire

On May 15, 2017, Ms. Harner completed a Disability Determination Service Headache Questionnaire.  (Doc. 6-13, p. 24).  She explained she had headaches once or twice a week, and they caused severe pain in her head and neck.  (Doc. 6-13, p. 24).  She also reported light sensitivity and that her headaches affected her vision and caused her to become nauseated and vomit.  (Doc. 6-13, p. 24).  She believed her neck pain, sinus issues, and lack of sleep caused her headaches.  (Doc. 6-13, p. 25).  Ms. Harner was taking Imitrex for the headaches, but the medication caused extreme fatigue.  (Doc. 6-13, p. 25).  Besides the medication, Ms. Harner would use ice packs and sit in a dark room to try and combat the headaches.  (Doc. 6-13, p. 25). She also tried massage therapy and chiropractic treatments.  (Doc. 6-13, p. 25).  She explained that her "severe headaches limit me & what I can do.  I can't do any work." (Doc. 6-13, p. 26).

### Fatigue Questionnaire

Ms. Harner also filled out a DDS Fatigue Questionnaire.  (Doc. 6-13, p. 27).[9] She explained she normally woke up between 9:00 and 10:00 a.m. daily, would take two one-hour naps throughout the day, and had problems sleeping because of pain and an inability to get comfortable.  (Doc. 6-13, p. 27).  She said that her husband

---

[9] The DDS Fatigue Questionnaire is undated.

helped her do laundry and take care of their pets.  (Doc. 6-13, p. 27).  Ms. Harner wrote that while her husband prepares and cooks most of her food, she would cook twice a day, usually making sandwiches and heating microwavable items.  (Doc. 6-13, p. 27).  She reported needing assistance carrying, lifting, and unloading groceries.  (Doc. 6-13, p. 28).  When she was in severe pain, Ms. Harner could be on her feet for around 30 minutes and would sometimes need a two- to three-hour break to rest before continuing an activity.  (Doc. 6-13, p. 28).

### Work History Report

Ms. Harner provided extensive information about her previous employment on the Social Security Administration's Work History Report.  (Doc. 6-13, p. 39).  She listed seven positions as either a receptionist or travel agent between March 1999 and August 2016.  (Doc. 6-13, p. 28).  In her most recent position as a medical office receptionist between April 2013 and August 2016, Ms. Harner reported that she greeted patients, answered the phone, and scheduled appointments.  (Doc. 6-13, p. 40).  She explained that she would walk about an hour a day, stand about an hour a day, sit about eight hours a day, stoop about 30 minutes a day, reach about 30 minutes a day, and write, type, or handle small objects about six hours a day.  (Doc. 6-13, p. 40).  She reported never climbing, kneeling, crouching, crawling, or handling, grabbing, or grasping big objects.  (Doc. 6-13, p. 40).  She did not lift anything.  (Doc. 6-13, p. 40).  Her job immediately preceding that, where she worked

between September 2011 and April 2013, had identical exertional requirements. (Doc. 6-13, p. 41).[10]

When Ms. Harner worked as a travel agent between February 2002 and January 2006, she sat for eight hours a day, knelt 30 minutes per day, and wrote, typed, or handled small objects eight hours a day.  (Doc. 6-13, p. 43).  Throughout all Ms. Harner's jobs, she explained that she never lifted or carried objects.  (*See* Doc. 6-13, pp. 40–45).

**Function Report**

Ms. Harner submitted a function report documenting her day-to-day life.  (*See* Doc. 6-13, p. 47).  She explained that from the time she wakes up to the time she goes to bed, she "stretch[es] to try to move and take my pain pills.  Eat a light breakfast.  Make the bed.  Read.  Do some laundry but my husband has to carry it to downstairs.  Eat lunch.  Take a nap or two to try to rest.  Occasionally I fix light meal a dinner.  Take more pain pills.  Then go to bed."  (Doc. 6-13, p. 47).  She explained that before her conditions developed, she would walk her dogs, exercise, ride bikes, sit and stand without hurting, go up and down steps without hurting, and do yard work.  (Doc. 6-13, p. 48).  She reported she is in constant pain and unable to sleep.  (Doc. 6-13, p. 48).  She had no problem feeding herself or using the toilet, but she

---

[10] So too did job number three where she worked as a medical receptionist between January 2006 and September 2010.  (*See* Doc. 6-13, p. 42).

reported pain trying to put on pants, standing too long in the shower, and bending over to shave.  (Doc. 6-13, p. 49).

Ms. Harner reported that when she would go out, she would drive herself in a car, and that she was able to drive alone.  (Doc. 6-13, p. 50).  She was able to shop in stores, usually once a week.  (Doc. 6-13, p. 50).  She was able to pay bills, count change, handle a savings account, and use a checkbook.  (Doc. 6-13, p. 50).

Ms. Harner explained that she would spend time with others, when able, usually by sitting and talking.  (Doc. 6-13, p. 51).  She said she attended church weekly when she was not in severe pain.  (Doc. 6-13, p. 51).  Since her conditions began, Ms. Harner has become "withdrawn and not as outgoing and involve[d] due to severe pain."  (Doc. 6-13, p. 52).

Ms. Harner wrote that she could only walk about 50 feet before needing to stop and rest.  (Doc. 6-13, p. 52).  Usually, she would rest 5-10 minutes before resuming walking, depending on the severity of her pain.  (Doc. 6-13, p. 52).  She wore a back brace daily for support and had been doing so for about five or six years. (Doc. 6-13, p. 53).  In the final remarks section, Ms. Harner wrote:

> I felt that my quality of life is not what it used to be.  My abilities, social life, activity level is not what they used to be.  Not able to bend, [illegible].  My focus level + concentration has suffered severely and my pain level has worse.  I am not rested due to pain.  Sleep aid doesn't help.

(Doc. 6-13, p. 54).

**Administrative Hearing**

On April 22, 2019, the ALJ held an administrative hearing on Ms. Harner's application for benefits. (Doc. 6-4, p. 2). Maranda Hanawalt, a non-attorney representative, appeared on Ms. Harner's behalf. (Doc. 6-4, pp. 2, 4). Ms. Harner testified that she lives in a camper parked in front of her friend's house. (Doc. 6-4, p. 7). She completed high school and received some technical training after she graduated. (Doc. 6-4, p. 8). She explained that the last job she held was as a receptionist at a medical office in Georgia where she worked for about three years. (Doc. 6-4, p. 9). The job required her to answer phones, prepare patient charts (including typing and checking insurance), check patients in and out of the office, take payments, and schedule appointments. (Doc. 6-4, p. 9). She had to lift up to 50 pounds, place office supply orders, unload and stack reams of printer paper, and stack water jugs in a water cooler. (Doc. 6-4, pp. 9–10). Ms. Harner had to leave the job because she was having too much pain, "and it was hard to sit and it was hard to do my duties because of all my pain." (Doc. 6-4, p. 9).

The ALJ asked Ms. Harner to explain, in her own words, why she believes she cannot work anymore. (Doc. 6-4, p. 10). She responded:

> I have low back pain. I had surgery a year and a half ago for low back -- for my back. I was tested positive in 2017 for lupus and thank God I've got more of all the fibro symptoms. I've got dry eyes. I've got joint and muscle pain, all my -- I got really bad -- I get a lot of bad headaches and migraines. I have shoulder pain. I have neck aches at the base of my neck which causes a lot of headaches. I've got shoulder

> pain, my elbows . . . and then my low back, as well as my hips, then my
> knees.  My hands constantly hurt.  It's affected me as far as writing
> because I like to journal.  It's affected my writing and even my typing
> and then my hands get number and tingle a lot and then all the way
> down -- even my right heel, in the back of my right heel even hurts and
> I get a lot of numbness and tingling in my feet.  I don't sleep well.  I
> may get three hours of sleep and that's even with my CPAP machine.

(Doc. 6-4, p. 11).  Ms. Harner explained that since her back surgery in 2017, she had

not had spinal blocks or steroid injections.  (Doc. 6-4, p. 12).

Ms. Harner testified that, beginning in 2018, she sought counseling for

depression.  (Doc. 6-4, pp. 12–13).  She began with weekly visits, but at the time of

her administrative hearing, Ms. Harner was going every other week.  (Doc. 6-4, p.

13).  The counseling was not helping with the symptoms of her depression.  (Doc.

6-4, p. 13).

The ALJ asked Ms. Harner to rate her day-to-day pain on a scale of 1 to 10,

"one being kind of a minor ache and ten being so excruciating, you'd need to go run

to the emergency room," and Ms. Harner testified it was at a ten.  (Doc. 6-4, pp. 13–

14).  She explained that pain medication did not really reduce her pain and that her

physicians were adjusting her medications.  (Doc. 6-4, p. 14).  Ms. Harner testified

that she was seeing a chiropractor for her back, but the treatment provided only

temporary relief and then "after a couple of hours, it's back to hurting again."  (Doc.

6-4, p. 14).

34

Ms. Harner testified about her migraines, explaining that she got them at least once each week and they would last "[a]t least a whole day, could goes [*sic*] into two." (Doc. 6-4, p. 16). When she got a migraine, Ms. Harner took Imitrex, rested in complete darkness, and used an eye cover to help alleviate the symptoms. (Doc. 6-4, p. 16).[11] She attributed the migraines to her severe neck pain, which is "right at the base of my neck. It's like something like stabbing it," a constant pain. (Doc. 6-4, p. 16).

Ms. Harner testified that her physicians told her not to lift more than 5 or 10 pounds, and she stated that she had trouble gripping items, taking lids off containers, and trouble writing. (Doc. 6-4, p. 18). She explained she could probably walk about 100 yards without having to stop and rest; she could lift a gallon of milk out of the refrigerator; she could extend her arms out in front of her and above her head; and that she could kneel carefully to the floor to pick something up that fell. (Doc. 6-4, pp. 20–21). She also told the ALJ she suffered from memory loss, lack of focus, and lack of concentration. (Doc. 6-4, p. 22).

---

[11] IMITREX, RXLIST, https://www.rxlist.com/imitrex-drug.htm ("Imitrex is a prescription medicine used to treat the symptoms of migraine headache and cluster headache. Imitrex may be used alone or with other medications. Imitrex is an antimigraine agent, serotonin 5-HT-Receptor antagonist.") (last visited Mar. 15, 2021).

On a typical day, Ms. Harner explained that she could get up, take a shower, and get dressed on her own. (Doc. 6-4, p. 22). But she "limited [her] showers to once every other day or once every two days because it's a task for me to have to try to do my hair and get ready." (Doc. 6-4, p. 22). She could prepare light, simple means for herself and do light laundry. (Doc. 6-4, p. 22). She did her grocery shopping and attended a weekly Bible study a weekly church service when she was able. (Doc. 6-4, p. 23). Ms. Harner testified that she had gone on several recent trips, including a trip to Nashville with some girlfriends and a trip to Ohio to visit family. (Doc. 6-4, pp. 25–26). Ms. Harner also made the following statement to the ALJ:

> I've worked since I was the age of 15. I've worked two and three jobs most of my life. I raised my brother when he was at the -- when he was at the age of 14 where I worked two and three jobs, cleaned the house while I was raising him. He's now 37 with a career in the Army. I've purchased two homes on my own. I've never taken advantage of the system. I've always prided myself in being a hard worker and thought my husband would support me in my deteriorating health but did not. Since my divorce last year, I've been wondering if, in part, it wasn't due to my physical pain affecting me mentally as well. This has been hard on my mental state with my health issues. I am currently going through counseling which you now know. I am now living in a camper in my friend's front yard because I have no other place to go. This entire process has been hard for me. I am -- I went from being very independent, a hard worker my whole life, purchased two homes being single, raised my brother being single, being very outgoing, very active and fun loving. Two, having failing health, which is painful physically and mentally; having to ask for help and I'm not at [*sic*] outgoing and active as I once was, and having -- and not having any independence or feeling of. I need the disability because I stay in too much pain to hold a job. I need an income. I need insurance so I can see my doctors and

36

labs, and get lab work, to give me some sense of independence back, to get out of this camper and I'm not able to rent anything or even get in income based housing without an income. I've been a hard worker my whole life and I've paid into the system for years. I've worked hard long as my body would allow me to. And I'm really sorry that I have to be here and to go through this, but I have no other option and I really appreciate you letting me read that.

(Doc. 6-4, p. 34).

After Ms. Harner testified, the ALJ placed a vocational expert, Melissa Brassfield, under oath and questioned her about Ms. Harner's claim. First, the vocational expert testified that Ms. Harner could perform her past work as a receptionist (*Dictionary of Occupational Titles* No. 237.367-038, SVP 4, sedentary) and a travel agent (*Dictionary of Occupational Titles* No. 252.152-010, SVP 5, sedentary). (Doc. 6-4, p. 36). The ALJ then posed the following hypothetical to Ms. Brassfield:

> let's assume a hypothetical individual of [Ms. Harner's] age and education. Let's further assume the same work experience and education. Let's further assume a light exertional level, occasionally climbing ramps or stairs, never climbing ladders, ropes or scaffolds; occasionally balancing, stooping, keeling, crouching and crawling; frequently reaching overhead bilaterally; must avoid all exposure to unprotected heights, unprotected moving mechanical parts and dangerous machinery. Could this hypothetical individual perform any of [Ms. Harner's] past work?

(Doc. 6-4, pp. 36–37). Ms. Brassfield testified that yes, the hypothetical individual could perform both of Ms. Harner's past jobs "[a]s generally performed for the receptionist, as actually and generally for the travel agent." (Doc. 6-4, p. 37). Ms.

Brassfield also testified that this hypothetical person could perform the work of an administrative clerk (*Dictionary of Occupational Titles* No. 219.362-010, SVP 4, light work), file clerk (*Dictionary of Occupational Titles* No. 206.387-034, SVP 3, light work), office helper (*Dictionary of Occupational Titles* No. 239.567-010, SVP 2, light work), and mail sorter (*Dictionary of Occupational Titles* No. 209-687-026, SVP 2, light work).  (Doc. 6-4, pp. 37–38).

The ALJ asked Ms. Brassfield a second hypothetical, with the same restrictions as the first but adding that the hypothetical individual "must alternate sitting and standing every 20 to 30 minutes throughout the workday in order to change position for a brief positional change of less than five minutes but without leaving the workstation."  (Doc. 6-4, p. 38).  Ms. Brassfield said that the additional restriction did not change the jobs available to such an individual.  (Doc. 6-4, pp. 38–39).  In a third hypothetical, the ALJ asked Ms. Brassfield to:

> assume a hypothetical individual of the claimant's age, education and work history.  Further assume a sedentary exertional level; occasionally climb ramps and stairs; never climbing ladders, ropes or scaffolds; occasionally balancing, stooping, kneeling, crouching or crawling; frequently reaching overhead bilaterally; occasionally handling and fingering bilaterally; must avoid all exposure to unprotected heights, unprotected moving mechanical parts and dangerous machinery; must alternate sitting and standing every 20 to 30 minutes throughout the workday in order to change positions for a brief positional change of less than five minutes but without leaving the workstation.  Could this hypothetical individual perform any of [Ms. Harner's] past work?

(Doc. 6-4, pp. 39–40).  Ms. Brassfield testified that this person could not perform Ms. Harner's past work and that "there would be no jobs [in the national economy] and that would be based on the limitation to sedentary work with occasional handling and fingering, those skills do not transfer into jobs that would fit within that, and additionally, there would be no jobs from the unskilled job base that I could identify."  (Doc. 6-4, p. 40).

Ms. Harner's representative asked Ms. Brassfield if "an individual would miss four or more days per month, would the individual be able to hold any of the past relevant work?"  (Doc. 6-4, p. 41).  Ms. Brassfield said no.  (Doc. 6-4, p. 41).

## Analysis

Ms. Harner argues that the ALJ erred for four reasons.  First, he "failed to accord proper weight" to her treating rheumatologist, Dr. Vishala Chindalore, her treating neurosurgeon, Dr. Michele Johnson, and her treating Nurse Practitioner Ramona Perry.  (Doc. 12, pp. 2, 16).  Second, the ALJ failed to properly consider her fibromyalgia under SSR 12-2p.  (Doc. 12, p. 2).  Third, the ALJ's finding that she can perform past work is not supported by substantial evidence.  (Doc. 12, p. 2).  Finally, the ALJ erred in holding that Ms. Harner's daily activities diminish the persuasiveness of her pain testimony.  (Doc. 12, p. 2).

### *The ALJ's Evaluation of Drs. Chindalore and Johnson and NP Pettry*

Citing *Phillips v. Barnhart*, 357 F.3d 1232 (11th Cir. 2003), and *Lewis v. Callahan*, 125 F.3d 1436 (11th Cir. 1997), Ms. Harner argues that an ALJ must "clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." (Doc. 12, p. 17). She contends that the ALJ failed to properly evaluate the opinions of her treating medical providers.

Because the new regulations that we have discussed apply to Ms. Harner's application for benefits, the ALJ did not have to articulate a reason for giving less weight to the opinion of a treating physician. The treating physician rule was retired when the new 2017 regulations took effect. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Rep. 5844-01, 5853, 2017 WL 168819 ("[W]e are not retaining the treating source rule in final [20 C.F.R. §§] 404.1520c . . . for claims filed on or after March 27, 2017.").[12]

The ALJ summarized the medical opinions provided by Drs. Chindalore and Johnson and NP Pettry:

> Rheumatologist Dr. Chindalore, who has treated [Ms. Harner] since June 22, 2017, provided an assessment indicating that [she] has been unable to work since August 5, 2016 with a limiting assessment of functioning due to medical findings of fibromyalgia, positive lupus test,

---

[12] For a thorough history of the treating physician rule in social security cases, *see generally* Charles Terranova, Comment, *Somebody Call My Doctor: Repeal of the Treating Physician Rule in Social Security Disability Adjudication*, 68 BUFF. L. REV. 931 (2020).

pressure point testing, and back fusion (Exhibit 30F).  Dr. Johnson from Atlanta Brain & Spine Care, who has treated [Ms. Harner] since June 7, 2017, also indicated that [she] was unable to work effective August 5, 2016 due to back fusion surgery, fibromyalgia, and chronic pain and signed [her] application for a disability parking placard (Exhibits 31F and 35F).  Ramona Pettry, CRNP-BC, who has treated [Ms. Harner] since July 2, 2018, indicated that due to [her] emotional disability, [Ms. Harner] has certain limitations coping with what would otherwise be considered normal, but significant day to day situations and recommended a service animal in addition to her treatment regimen (Exhibit 33F).

(Doc. 6-3, p. 50).  The ALJ "considered [these] medical opinion[s] . . . in accordance with the requirements of 20 CFR 404.1520c."  (Doc. 6-3, p. 46).  He concluded that the three providers' assessments were not persuasive, "as they are not supported by or consistent with the medical evidence, particularly the evidence demonstrating improvement and resolution of [Ms. Harner's] leg pain following back surgery and conservative care."  (Doc. 6-3, p. 50).  The ALJ stated:

Treatment records referenced positive fibromyalgia tender points, swelling and deformity of the hands, crepitus in both knees, osteoarthritis changes, obesity, painful range of motion, and muscle spasms; however, [Ms. Harner] has maintained normal findings in relation to her grip, extremity strength, gait, range of motion of most major joints, and sensory and motor function (Exhibits 36F, 37F, and 38F).  The record provided multiple clinical entries documenting that her pain symptoms were stable on her treatment regimen (Exhibits 29F, 32F, 34F, and 37F).  ANA was only slightly abnormal and lupus panel was negative (Exhibit 32F).  Mentally, she had no prior history of counseling except for marital issues stemming from a divorce.  It was not until recently in August 2018 that she sought actual mental health treatment with Ms. Pettry (Exhibit 36F).  However, in those records and in the most recent note in April 2019 indicated improvement in her mental health on her treatment regimen (Exhibit 38F).  There was no indication that Ms. Pettry felt that [Ms. Harner's] condition was so

severe as to warrant referral for impatient hospitalization.  Instead, [Ms. Harner] continued to be treated with changing doses of her medications with good results.  Likewise, [she] indicated that she is able to do her own activities of daily living, shop, and travel (Exhibit 10E and hearing testimony).

(Doc. 6-3, p. 50).

Under the new regulations, the ALJ adequately accounted for his finding that the medical opinions from Ms. Harner's treating physicians were not persuasive. This is not a situation where the ALJ "provided two [] sentences in which he stated broad conclusions without explaining his analysis regarding consistency and supportability." *Works v. Saul*, No. 4:19-cv-01515-MHH, 2021 WL 690126, at *15 (N.D. Ala. Feb. 23, 2021).  Here, the ALJ cited to specific pieces of inconsistent evidence in the record and pointed out why he believed Drs. Chindalore and Johnson and NP Pettry provided unsupportable opinions.  (Doc. 6-3, p. 50).  Substantial evidence supports the ALJ's analysis of the medical opinions from Ms. Harner's treating physicians.[13]

---

[13] The Court does not believe a claimant has to have been hospitalized for mental health treatment to demonstrate a severe mental health limitation, but the ALJ's analysis of Ms. Harner's mental health concerns otherwise is supported by substantial evidence.

42

***The ALJ Did Not Err in Considering Ms. Harner's Daily Activities***

Relying on *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245 (11th Cir. 2019), where the Eleventh Circuit Court of Appeals noted that the claimant's daily activities "were mostly, if not all, solitary" and the activities did not "discount the treating physicians' opinions that [the claimant] suffered significantly . . . ," *Schink*, 935 F.3d at 1264, Ms. Harner argues that the ALJ improperly discounted her testimony regarding her daily activities. She notes that "[t]he ability to perform the limited activities noted by the ALJ does not rule out the presence of disabling pain. The ability to watch television, do occasional shopping, or perform other sporadic activities does not mean the plaintiff is not disabled." *Early v. Astrue*, 481 F. Supp. 2d 1233, 1238 (N.D. Ala. 2007).

In *Schink*, the Eleventh Circuit considered whether the claimant's activities of daily life contradicted the treating physicians' opinions. 935 F.3d at 1264. As discussed above, the treating physician presumption no longer applies. The ALJ did not rely on Ms. Harner's testimony about her day-to-day activities when considering the persuasiveness of her treating physicians' medical opinions. Rather, the ALJ considered her daily activities with respect to her allegations of disabling pain:

> [Ms. Harner's] daily activities are not entirely consistent with her allegations of disabling symptoms. At the hearing, she asserted a limited lifestyle due to pain, memory loss, and lack of focus and concentration. For example, she claimed that she was unable to function due to constant pain of a 10/10 level. However, the record indicates that she performs a variety of activities. For instance, she

remains actively involved in her church and activities.  She attends bible study once a week and church once a week.  She is also able to read, do household chores, prepare meals, drive, pay bills, handle a savings account, use a checkbook, and spend time with others (Exhibits 10E, 36F, and 38F).  She enjoys reading and she spends time on the internet.  She testified to taking long road trips recently to Ohio and Nashville with friends and her brother.

(Doc. 6-3, p. 49).  The ALJ found that Ms. Harner's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ."  (Doc. 6-3, p. 47).  The ALJ considered Ms. Harner's daily activities only as part of his analysis of her pain, and he considered her total activities together with objective medical evidence.  (*See* Doc. 6-3, pp. 47–49).

Ms. Harner's reliance on *Early* is closer to the mark, but because substantial evidence supports the ALJ's analysis, *Early* does not offer Ms. Harner relief.  In *Early*, as here, the ALJ considered the claimant's activities of daily life when evaluating a claim under the pain standard.  *Early*, 481 F. Supp. 2d at 1238.  The court in *Early* noted that the specific activities of daily living the ALJ recited did not support a finding that the claimant's pain testimony was not true.  *Early*, 481 F. Supp. 2d at 1238.  The Court wrote:  "[t]he ability to watch television, do occasional shopping, or perform other sporadic activities does not mean that the plaintiff is not disabled."  *Early*, 481 F. Supp. 2d at 1238.

The Eleventh Circuit has explained that if an ALJ "decides not to credit the claimant's testimony about her subjective symptoms, the ALJ must articulate explicit and adequate reasons for doing so unless the record obviously supports the credibility finding." *Meehan v. Comm'r of Soc. Sec.*, 776 Fed. Appx. 599, 603 (11th Cir. 2019) (citing *Foote v. Chater*, 67 F.3d 1553, 1561–62 (11th Cir. 1995)).

Here, the ALJ relied on Ms. Harner's activities of daily life together with extensive medical evidence, and the ALJ highlighted activities that were not solitary and did not evidence limitations like trips and church activities. (*See* Doc. 6-3, pp. 47–49). The ALJ provided specific evidentiary record citations that contradict Ms. Harner's subjective complaints. Thus, the ALJ clearly articulated his findings about Ms. Harner's subjective complaints of pain and explained why he found them inconsistent with the evidence in the record.

### The ALJ Properly Analyzed Ms. Harner's Fibromyalgia Under SSR 12-2p

Ms. Harner next argues that the ALJ failed to properly analyze her fibromyalgia under SSR 12-2p. (Doc. 12, p. 18). SSR 12-2p took effect July 25, 2012 and "provides guidance on how [the Commissioner of Social Security] develop[s] evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how [the Commissioner] evaluate[s] fibromyalgia in disability claims . . . ." SSR 12-2p, 2012 WL 3104869, at *1 (July 25, 2012). The ruling explains that "longitudinal records reflecting ongoing medical evaluation and

treatment from acceptable medical sources are especially helpful in establishing both the existence and severity" of a claimant's fibromyalgia.   SSR 12-2p, 2012 WL 3104869, at *3.

The Commissioner has asked the Court to disregard Ms. Harner's request for review of the ALJ's fibromyalgia analysis.  (Doc. 16, p. 19).  The Commissioner points out that Ms. Harner "does not spell out her argument squarely or distinctly as to why she believes the ALJ's fibromyalgia assessment was deficient.  Rather, [she] block quotes several cases discussing fibromyalgia but she makes no attempt to tie them to any alleged error by the ALJ."  (Doc. 16, p. 19).  The Commissioner argues Ms. Harner has abandoned the argument.  (Doc. 16, p. 19) (citing *Doe v. Moore*, 410 F.3d 1337, 1349 n.10 (11th Cir. 2005)).

The Commissioner's description of Ms. Harner's fibromyalgia argument is correct.  In her brief, Ms. Harner block quoted portions of several Eleventh Circuit Court of Appeals and Northern District of Alabama cases, (*See* Doc. 12, pp. 19–20), but she did not articulate a specific error that the ALJ made in analyzing her fibromyalgia under SSR 12-2p.  The Court is left to speculate about how Ms. Harner believes the ALJ failed to properly analyze her fibromyalgia.  Nonetheless, the Court will review the ALJ's analysis against the backdrop of SSR 12-2p to make sure he properly assessed her fibromyalgia.

When evaluating a claimant's statements about her symptoms and functional limitations related to fibromyalgia, an ALJ must follow a two-step process. SSR 12-2p, 2012 WL 3104869, at *5. First, "[t]here must be medical signs and findings that show the person has a [medically determinable impairment] which could reasonably be expected to produce the pain or other symptoms alleged." SSR 12-2p, 2012 WL 3104869, at *5. After determining a medically determinable impairment like fibromyalgia, the ALJ "evaluate[s] the intensity and persistence of the person's pain or any other symptoms and determine the extent to which the symptoms limit the person's capacity for work." SSR 12-2p, 2012 WL 3104869, at *5. "If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, [the ALJ] consider[s] all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." SSR 12-2p, 2012 WL 3104869, at *5.

Under SSR 12-2p, an ALJ must consider whether the claimant's impairments meet or medically equal the criteria of any listings in the Listing of Impairment in appendix 1, subpart P of 20 C.F.R. Part 404 (appendix 1). SSR 12-2p, 2012 WL 3104869, at *6. But because fibromyalgia is not a listed impairment, it cannot meet

a listing in appendix 1. SSR 12-2p, 2012 WL 3104869, at *6. So, at step 3, the ALJ must "determine whether [fibromyalgia] medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment." SSR 12-2p, 2012 WL 3104869, at *6.

Here, the ALJ properly determined that Ms. Harner's severe impairments included fibromyalgia. (Doc. 6-3, p. 44). The ALJ noted there is no specific listing for fibromyalgia, and he evaluated Ms. Harner's fibromyalgia under listing 14.09D for inflammatory arthritis, as well as listing 1.04 for degenerative disc disease. (Doc. 6-3, p. 46). "However, [Ms. Harner] does not have repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level: limitation of activities of daily living; limitation in maintaining social functioning; or limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace." (Doc. 6-3, p. 46). So, the ALJ concluded that Ms. Harner did not have an impairment or combination of impairments that met or medically equaled the severity of one listed in 20 C.F.R. Part 404, Subpart P Appendix 1. (Doc. 6-3, p. 46).

The ALJ explained the evidence he considered with respect to Ms. Harner's functional limitations and restrictions in activities of daily living.  (Doc. 6-3, p. 47).  "Those reports document difficulties with lifting, squatting, bending standing, reaching, walking, sitting kneeling, stair climbing, using her hands, memory, completing tasks, concentration, understanding, following instructions, getting along with others, engaging in social activities, and handing [*sic*] stress and changes in routine."  (Doc. 6-3, p. 47).  After considering medical evidence and Ms. Harner's testimony at her hearing, the ALJ concluded that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ."  (Doc. 6-3, p. 47).  The ALJ specifically considered evidence of Ms. Harner's fibromyalgia, explaining that:

> [t]here is also little evidence specific to her fibromyalgia other than references to slightly elevated ANA, low C3, positive trigger points (all) with swelling and deformities in both hands, crepitus in both knees, osteoarthritis changes, muscle spasms, and painful range of motion of all extremities.  Imaging of the hands showed mild to moderate joint space narrowing of the PPIPs, DIPs, and carpometacarpal arthritis noted bilaterally (Exhibit 16F/11).  X-rays of the knees showed mild to moderate medial joint space narrowing but no other significant abnormalities such as chondrocalcinosis or erosions (Exhibit 16F/11).  X-ray of the pelvis was normal and showed no obvious sacroiliitis and an unremarkable lower lumbar spine.  Throughout the course of treatment, there was no evidence of effusions, oral ulcers, photosensitivity, or skin rashes.  She had a normal bone density scan (Exhibit 10F/7).  Moreover, there was no clinical criteria for lupus but

49

osteoarthritis/fibromyalgia symptoms successfully treated with changing doses of Cymbalta (most recently in April 2019) (Exhibits 16F/5 and 29F/2 and 4).

(Doc. 6-3, p. 48).

The ALJ explained that "[t]reatment records through April 2019 continued to document [Ms. Harner's] self-reports of pain symptoms along with the conservative treatment of the prescribing of medications, chiropractic therapy, and the start of mental health treatment in August 2018." (Doc. 6-3, p. 48). The ALJ noted that records show Ms. Harner's fibromyalgia "remained stable on her treatment regimen," and "[t]hrough April 2019, [Ms. Harner] continued to improve in regards to her fibromyalgia . . . ." (Doc. 6-3, p. 48). While Ms. Harner's treatment notes reflected the positive fibromyalgia tender points, "the examiner noted that [Ms. Harner] entered the room without difficulty and was able to sit comfortably throughout the duration of the exam." (Doc. 6-3, p. 49). And while her "[t]reatment records through April 2019 continued to reference the deficits" Ms. Harner experienced, they "also [showed] normal findings in relation to her grip, extremity strength, gait, range of motion of most major joints, and sensory and motor function." (Doc. 6-3, p. 49). The ALJ also accounted for Ms. Harner's limitations relating to fibromyalgia by including postural, manipulative, and environmental restrictions in his RFC. (*See* Doc. 6-3, p. 46).

Finally, the ALJ explained that Ms. Harner's "daily activities are not entirely consistent with her allegations of disabling symptoms." (Doc. 6-3, p. 49). Ms. Harner "remains actively involved in her church and activities. She attends bible study once a week and church once a week. She is also able to read, do household chores, prepare meals, drive, pay bills, handle a savings account, use a checkbook, and spend time with others. She enjoys reading and she spends time on the internet. She testified to taking long road trips recently to Ohio and Nashville with friends and her brother." (Doc. 6-3, p. 49).

Ms. Harner argues her case is like *Somogy v. Comm'r of Soc. Sec.*, 366 Fed. Appx. 56 (11th Cir. 2010). (Doc. 12, p. 19). In *Somogy*, the Eleventh Circuit found that the ALJ improperly discounted the claimant's physician's opinion because the physician's notes were based on the claimant's subjective complaints of pain. *Somogy*, 366 Fed. Appx. at 63. The court "recognized that fibromyalgia 'often lacks medical or laboratory signs, and is generally diagnosed mostly on an individual's described symptoms,' and that the 'hallmark' of fibromyalgia is therefore 'a lack of objective evidence.'" *Somogy*, 366 Fed. Appx. at 63 (quoting *Moore v. Barnhart*, 405 F.3d 1208, 1211) (11th Cir. 2005)). So, "[t]he lack of objective clinical findings is, at least in the case of fibromyalgia, therefore insufficient alone to support an ALJ's rejection of a treating physician's opinion as to the claimant's functional

imitations." *Somogy*, 366 Fed. Appx. at 64 (citing *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)).

But the ALJ did not rely on a lack of objective clinical findings alone to reject Ms. Harner's treating physicians' opinions with respect to her limitations. Rather, the ALJ explained that Ms. Harner's self-reported activities -- including weekly trips to church and bible study, car trips to Ohio and Tennessee, reading, and doing household chores -- combined with the objective clinical findings led him to disbelieve Ms. Harner's allegations of disabling physical limitations. (*See* Doc. 6-3, pp. 49–51). So, *Somogy* is inapposite.

While "the ALJ did not specifically cite to Ruling 12-2p, substantial evidence supports the conclusion that the ALJ properly evaluated [Ms. Harner's] fibromyalgia under the two-step process set out in the Ruling because he considered the medical evidence, found that [Ms. Harner] had a severe impairment, and evaluated that impairment using the five-step process." *Sorter v. Soc. Sec. Admin., Comm'r*, 773 Fed. Appx. 1070, 1073 (11th Cir. 2019). The mere existence of Ms. Harner's fibromyalgia "does not reveal the extent to which [it] limit[s] her ability to work . . . ." *Moore*, 405 F.3d at 1213 n.6 (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)). The ALJ complied with SSR 12-2p, and substantial evidence supports his analysis of Ms. Harner's fibromyalgia.

 *Substantial Evidence Supports the ALJ's Finding That Ms. Harner Could Perform Past Work*

Ms. Harner argues that the ALJ erred in finding that she could perform past work.  (Doc. 12, p. 21).  Citing *Nelms v. Bowen*, 803 F.2d 1164, 1165 (11th Cir. 1986), and *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987), Ms. Harner contends that the ALJ "must make a finding of the physical requirements and demands of the claimant's past work."  (Doc. 12, p. 22).

After the ALJ assessed Ms. Harner's RFC, he needed to determine if she could perform her past relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).  The burden was on Ms. Harner to prove she could not perform her past relevant work either as she performed it or as it is generally performed in the national economy.  *Long v. Acting Comm'r of Soc. Sec. Admin.*, 749 Fed. Appx. 932, 934 (11th Cir. 2018) (citing *Jackson v. Bowen*, 801 F.2d 1291, 1293–94 (11th Cir. 1986)).  "In making this determination, the ALJ must consider all the duties of the claimant's past work and evaluate [her] ability to perform them in spite of [her] impairments."  *Long*, 749 Fed. Appx. at 934 (citing *Lucas v. Sullivan*, 918 F.2d 1567, 1574 n.3 (11th Cir. 1990)).  "The ALJ may rely on a vocational expert's testimony regarding the physical and mental demands of the claimant's past work, and may also consider the job descriptions set forth in the Dictionary of Occupational Titles (DOT)."  *Long*, 749 Fed. Appx. at 934 (citing 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2).  "When there is no evidence of the

physical requirements and demands or the required duties of past work, the ALJ cannot properly determine whether the claimant has the residual functional capacity to perform past relevant work." *Long*, 749 Fed. Appx. at 934 (citing *Cannon v. Bowen*, 858 F.2d 1541, 1545–46 (11th Cir. 1988)).

Here, the vocational expert testified that Ms. Harner worked as both a receptionist and a travel agent. (Doc. 6-4, p. 36). She provided the DOT listings for each. (Doc. 6-4, p. 36) (DOT No. 237.367-038, SVP 4, Sedentary (Receptionist); DOT No. 252.152-010, SVP 5, Sedentary (Travel Agent)). The vocational expert also testified that she reviewed Ms. Harner's file and listened to her testimony regarding her work history. (Doc. 6-4, p. 36). The file noted Ms. Harner's jobs as actually performed. (*See* Doc. 6-13, pp. 39–45). The ALJ based his opinion on the vocational expert's testimony, Ms. Harner's testimony, and Ms. Harner's work history forms. (*See* Doc. 6-3, p. 52) ("Based on the residual functional capacity found herein and [Ms. Harner's] other vocational factors, the vocational expert testified that [she] could perform her past relevant work."). He found that Ms. Harner "is able to perform the work as a receptionist as it is generally performed and the work as a travel agent as it is actually and generally performed." (Doc. 6-3, p. 52).

The Eleventh Circuit has held that an ALJ satisfies his duty to develop a full record on the requirements of the claimant's past work when the record includes "[t]he Work History Report, the testimony of [the claimant] and the vocational expert, and the DOT" which "combine to paint a full picture of [the claimant's] past relevant work—both as she performed it herself, and as it is generally performed." *Holder v. Soc. Sec. Admin.*, 771 Fed. Appx. 896, 900 (11th Cir. 2019). Because the ALJ considered Ms. Harner's work history report, Ms. Harner's testimony, the vocational expert's testimony, and the DOT listings, he painted a full picture of Ms. Harner's past relevant work history and satisfied his obligation to develop the record.[14]

---

[14] In her reply brief, Ms. Harner argues that the ALJ failed to properly apply Grid Rule 201.14 as applicable to sedentary work, which provides that if a claimant is closely approaching advanced age and is a high school graduate, but does not have an education providing direct entry into skilled work, and her previous work experience consists of either unskilled or semi-skilled work with skills that are non-transferrable, then the claimant is found to be disabled. (Doc. 17, p. 6) (citing 20 C.F.R. § 404, Subpart b, App.2, Table No. 1). But Ms. Harner makes no mention of the Grid Rule in her memorandum in support of disability. The Eleventh Circuit Court of Appeals is clear that courts "decline 'to consider issues raised for the first time in an appellant's reply brief,' and that we 'ha[ve] repeatedly denied motions to file supplemental briefs that seek to raise new issues not covered in an appellant's initial brief on appeal.'" *U.S. v. Britt*, 437 F.3d 1103, 1104 (11th Cir. 2006) (quoting *United States v. Levy*, 416 F.3d 1273, 1276 n.3 (11th Cir. 2005), *cert. denied*, 546 U.S. 1011 (2005)). Because Ms. Harner did not raise her Grid Rule argument in her initial brief, the Court will not consider the argument.

**Sentence Six Remand**

Ms. Harner has asked the Court to remand her case to the Commissioner under Sentences Four and Six of 42 U.S.C. § 405(g).  (Doc. 18).  With respect to Sentence Four, this opinion addresses Ms. Harner's argument that "the denial [of benefits] is not based on substantial evidence in that the ALJ repudiated evidence and opinions of [her] treating rheumatologist, Dr. Chindalore and [her] treating orthopedic, Dr. Johnson."  (Doc. 18, p. 1).

With respect to Sentence Six, Ms. Harner points to the fact that the Commissioner found her disabled as of October 22, 2020, (Doc. 18-1, p. 1), and this subsequent favorable decision constitutes new evidence that was not available to the ALJ in May 2019 when he made his decision.  (Doc. 18, p. 1).  According to Ms. Harner, "[t]he subsequent favorable decision undermines the ALJ's decision to accord little weight to" her treating physicians.  (Doc. 18, p. 1).

Sentence Six remand is appropriate when a claimant establishes that there is new, noncumulative evidence; that the evidence is material such that a reasonable probability exists it will change the administrative result; and that there was good cause for failure to submit it at the administrative level.  *See Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 821 (11th Cir. 2015).  Ms. Harner does not show that a later finding of disability with a disabled date nearly 17 months after the ALJ rendered his decision on this benefit application would change the administrative

result.  She also does not provide context for the new finding of disability, so the Court does not know why the Commissioner has now found her disabled.  "A decision is not evidence nay more than evidence is a decision," and "'a subsequent favorable decision itself, as opposed to the evidence supporting the subsequent decision, does not constitute new and material evidence under § 405(g).'"  *Hunter*, 808 F.3d at 822 (quoting *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 653 (6th Cir. 2009)).  Accordingly, the Court denies Ms. Harner's motion to remand under Sentence Six.

### Conclusion

For the reasons discussed above, the Court affirms the decision of the Commissioner of Social Security.

**DONE** and **ORDERED** this March 31, 2021.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE